

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | **SEALED** |
| v. | § § | Case No. 4:23 cr270 |
| MARINA BROOKS (1)<br>CHARLES BROOKS (2)<br>a/k/a "Chuck"<br>CRYSTAL BROOKS (3) | § § § § § | Judge Mazzant |

## INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times material to the facts set forth in this Indictment:

1. Defendants **Charles Brooks**, **Marina Brooks**, and **Crystal Brooks** lived in a single residence in Irving, Texas.

2. Defendant **Charles Brooks** opened and registered multiple businesses in Texas, including DFW Vision International LLC, Vision MI LLC, Now N Here Inc., and Su Vida LLC. Defendants **Charles Brooks** and **Marina Brooks** managed these businesses, while their daughter, defendant **Crystal Brooks**, acted as a marketing director.

3. Between 2014 and 2023, **Charles**, **Marina**, and **Crystal Brooks** opened multiple business and personal accounts, including the following:

    a. On or about April 18, 2022, **Charles Brooks** and **Marina Brooks** opened Comerica Bank Account ending in 9354 ("Comerica 9354") in the name of Su Vida, LLC, with signers **Charles Brooks** and **Marina Brooks**.

    b. On or about May 1, 2018, **Charles Brooks** opened a bank account at JPMorgan Chase ending in 0752 ("JPMC 0752") in the name of Now N Here Inc., with signers **Charles Brooks** and an individual with initials Y.P.

  c. On or about September 17, 2021, a personal account was opened at Comerica Bank ending in 8244 ("Comerica 8244"), with signers **Marina Brooks** and **Crystal Brooks**.

  d. On or about December 3, 2019, **Charles Brooks** opened a Wells Fargo account ending 5571 ("WF 5571") in the name of Vision MI, LLC, with sole signer **Charles Brooks**.

4. In or around May 2019, law enforcement agents opened an undercover bank account at Bank of America ending in 9411 ("BOA 9411"). The account was intended for use in undercover law enforcement operations.

## COUNT 1

Violation: 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)

5. The General Allegations section of this Indictment is realleged and incorporated by reference as though fully set forth herein.

6. From in or around 2014 and continuing through the date of this Indictment, in the Eastern District of Texas and elsewhere, the defendants, **Marina Brooks**, **Charles Brooks**, and **Crystal Brooks**, along with others both known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree to violate 18 U.S.C. § 1343, wire fraud, that is to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce any writings, signs, signals, pictures, and sounds for the purpose of executing a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent material pretenses, representations, and promises.

### Overview of the Conspiracy

7. Beginning in 2014 and continuing through the date of this Indictment, the defendants **Marina, Charles**, and **Crystal Brooks**, and their co-conspirators fraudulently solicited investments from individuals residing in Texas for a multitude of projects. These investment "opportunities" included, but were not limited to, entertainment ventures relating to concert series and cryptocurrency-related projects. Through marketing seminars, radio advertisements, and in-person meetings, the defendants represented that these investment opportunities would yield significant returns relative to market standards. In reality, the defendants transferred the victim investor funds to other business and personal accounts, took out commissions and cash withdrawals, and lost over 95% of the funds taken from victim investors. All told, the defendants fraudulently took at least $9.5 million from at least 100 victim investors.

### Purpose of the Conspiracy

8. It was the general purpose of the conspiracy for the defendants to unlawfully and unjustly enrich themselves by obtaining money from victim investors by means of materially false and fraudulent pretenses, representations, and promises.

### Manner and Means of the Conspiracy

9. The manner and means by which the defendants sought to accomplish the conspiracy included, among others, the following:

   a. The defendants used their businesses, including DFW Vision International LLC, Vision MI LLC, Now N Here Inc., and Su Vida LLC, to solicit funds from prospective investors;

b. The defendants partnered with individuals in California and other states to obtain marketing materials and products shown and sold to investors;

c. The defendants opened and used various bank accounts, including the bank accounts listed in the General Allegations section, to receive, transfer, and withdraw investor funds;

d. The defendants falsely represented to victims, including those in the Eastern District of Texas, that the investment opportunities would yield significant returns exceeding typical market returns;

e. The defendants targeted Hispanic immigrants who were not fluent in English and who were not college-educated;

f. The defendants reached out to and pitched investors through, among other means, marketing seminars, individual meetings, and radio advertisements broadcast in the Eastern District of Texas;

g. The defendants told victim investors that their funds would be used for a designated purpose, *i.e.*, shares in the business venture or the investment opportunity;

h. The defendants, in order to legitimize their scheme, forced victim investors to execute written contracts, knowing full well that many of the investors were not fluent in English and were not legally represented;

i. The defendants received investments in multiple payment forms, including cash, wire transfers, check, cryptocurrency, and Zelle;

j. The defendants did not use the investor funds as promised, but instead transferred the funds to other business and personal accounts, withdrew the funds in cash, paid themselves commissions and salaries, and made personal expenditures;

k. The defendants engaged in payments to co-conspirators, cash withdrawals, and transfers to other businesses to conceal the true nature of their fraudulent conduct;

l. The defendants engaged in transactions in excess of $10,000 with the money obtained as a result of their fraud scheme; and

  m. The defendants caused wire transfers and financial transactions that affected interstate and foreign commerce.

## Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, the defendants committed the following acts, among others, in the Eastern District of Texas and elsewhere.

### *The Investment Opportunities*

10. The defendants presented a number of speculative "projects" to investors, all of which the defendants claimed would yield high rates of return on investment. In particular, the defendants solicited investments in entertainment ventures, including concerts featuring popular deceased singers and documentaries about exotic dancers. For instance, beginning in 2014, **Marina Brooks** made appointments with individual prospective investors to pitch a 3D-holographic concert series featuring music by Mexican singer-actor Pedro Infante. According to the representations made to investors, the concerts were set to be held in the United States, and later, Spain and Mexico. Later, in approximately 2016, **Marina Brooks** advised investors that investments in the Pedro Infante concert series would be rolled over and re-invested in a similar holographic project featuring American singer James Brown.

11. The defendants also marketed investments in various crypto-related projects, including cryptocurrency and coin "mining" machines such as Nesten, NXtream, and G1 machines. In a radio interview that was aired on a Spanish broadcast station, **Marina Brooks** detailed the crypto "assets" available to investors, stating, among other things, that: each asset would earn "100%" return on investment; investors could earn money immediately

with the virtual coins; and the NXtream machine would deposit money to investors daily, which could be transferred to a bank or withdrawn.

12.  The other defendants assisted in soliciting investments for these various schemes. For instance, **Charles** and **Crystal Brooks** appeared on a promotional video for Nesten touting the product's ingenuity and promise. **Charles Brooks** opened, registered, and managed the various business entities and bank accounts, and made arrangements with individuals and companies to use their marketing materials and products in the Brooks' schemes.

### *Examples of Investors*

### Undercover Investment

13.  On or about May 29, 2023, an undercover law enforcement agent ("UCA") posing as a Spanish-speaking investor called **Marina Brooks** from a location in the Eastern District of Texas. On the phone call, the UCA expressed an interest in potentially investing in the Brooks' business ventures. In response, **Marina Brooks** instructed the UCA to come to the Brooks' office for an in-person meeting.

14.  On or about June 9, 2023, the UCA met with **Marina Brooks** at her office. At the meeting, **Marina Brooks** presented investment opportunities in both entertainment and cryptocurrency-related projects. With respect to the crypto-related "machine," **Marina Brooks** stated that the UCA would be making money "daily" on the purchased machine. When the UCA stated that the UCA was "scared" about the investment opportunity, **Marina Brooks** advised the UCA to "calm down" and that the UCA would not "lose anything."

Following these representations, the UCA agreed to provide $12,000 to the Brooks to be used in two ways: (1) $3,000 for the purchase of a G1 cryptocurrency machine; and (2) $9,000 for shares in the Brooks' entertainment company called Su Vida.

15.    At the June 9, 2023 meeting, the UCA provided the Brooks one cashier's check for $12,000. The check was purchased at a Bank of America location in the Eastern District of Texas and drawn on BOA 9411. On that same day, the checks were deposited in **Charles** and **Marina Brooks'** Comerica account 9354. At the time of the deposit, the Brooks' Comerica account 9354 had a balance of approximately negative $600. Within approximately one week of the UCA's investment, the Brooks exhausted the entirety of the funds in a manner inconsistent with the representations made. For instance, the Brooks took out a $5,000 cash withdrawal, transferred approximately $3,900 to an unrelated business account, and made travel purchases, phone payments, and loan payments.

16.    Following the investment, the UCA never received money back from the Brooks, investment returns, or the $3,000 machine that was ordered. On or about September 9, 2023, the UCA called **Marina Brooks** regarding the status of her investment and was assured that the investment was secure, and that the box was generating coins even without the UCA actually having the box.

### Investor A.P.

17.    In or around 2016, after hearing a Spanish radio station advertisement featuring the Brooks, an individual with initials A.P. reached out to **Marina Brooks** regarding investment opportunities. Over the next several months, **Marina** and **Charles Brooks**

pitched numerous investment opportunities to A.P., including but not limited to entertainment and cryptocurrency related ventures. The Brooks touted the profitability of these investment opportunities, claiming that A.P. would become "a millionaire in no time." For instance, **Marina Brooks** originally represented that the G1 Nesten cryptocurrency machines purchased by A.P. would generate between $100-$200 in value each day. Based on these representations, A.P. made at least 50 investments with the Brooks to purchase G1 cryptocurrency machines and for other projects endorsed by the Brooks. A.P.'s investments consisted mostly of checks, which were deposited directly in numerous Brooks' accounts, including **Charles Brooks'** JPMC 0752 account and **Marina** and **Crystal Brooks'** personal Comerica 8244 account. In reality, A.P.'s investments never yielded the promised returns, and in total, A.P. lost at least $190,000.

### Investor N.C.

18.     In or around May 2020, an individual with initials N.C. heard a Spanish radio advertisement about investment opportunities with **Marina Brooks**. Shortly after hearing the advertisement, N.C. met with **Marina Brooks** at her office to discuss the prospect of an investment. Specifically, **Marina Brooks** described an investment opportunity in Vision MI, where famous musicians such as James Brown would perform in animated concerts. **Marina Brooks** further explained that the minimum investment was $5,000, and that the investor could expect a return within one year. During the same meeting, **Marina Brooks** also discussed available cryptocurrency assets, including a G1 box that would generate immediate income for the investor. Based on these representations, N.P. wrote checks

totaling over $40,000 to the Brooks' companies, which were deposited in **Charles Brooks'** WF 5571 account and others. N.P. did not receive any returns on, or refund of, the original investment.

### *Communications Regarding the Investments*

19. The defendants met with investors at various points during their scheme to discuss the status of the investments. For example, in or around August 2022, **Marina Brooks** invited five of the Brooks' highest-dollar investors in the Nesten product to a private meeting. Despite receiving over $500,000 from these investors, **Marina Brooks** told the investors that the Nesten investor money was "all gone" and claimed that the Nesten owners in California took all the money. At another large group investor meeting, an investor's relative confronted the Brooks about the legitimacy of their business. In response, **Marina Brooks** instructed the investor to never bring American, English-speaking people to the meetings. In or around November 2022, investor A.P. met with one of the Brooks' employees, J.R., and J.R.'s partner, during which A.P. was advised that the **Brooks'** were telling "lies" and to stop investing in the Brooks' businesses.

20. The defendants and their co-conspirators also coordinated internally on how to address investor concerns. For example, in late 2022, **Marina** and **Charles Brooks** met with two employees to discuss how to explain the financial losses to their investors. **Marina Brooks** instructed her employees to tell investors that the money was gone, taken by another business called "Quantum Media," and that the financial losses were a function of President's Biden's election, the COVID-19 pandemic, and the economy. In early 2023, **Marina** and

**Charles Brooks** again met with these two employees, this time to discuss a new investment opportunity and the strategy to persuade old investors to contribute again. Despite suggestions about returning some of the prior investments, **Marina Brooks** rejected the proposal and stated that the money was not to be returned.

### *Use of Investor Funds*

21. The defendants spent investor funds in a manner inconsistent with the representations made to the investors. The defendants actually paid themselves commissions, made payments to other businesses, took out large cash withdrawals, and engaged in other transactions unrelated to legitimate investor fund use. The following transactions illustrate the types of transactions using investor funds:

   a. On or about January 2, 2020, and using investor funds sourced from M.D., **Charles Brooks** executed a cash withdrawal of approximately $42,000 from WF 5571.

   b. Between in or around August 2015 and through December 2018, and using investor funds deposited into JPMC 7112, **Marina** and **Charles Brooks** made over $20,000 in payments to an employee for salary and rent payments.

   c. Between in or around December 2017 and through August 2023, **Marina Brooks'** account at Coinbase transferred approximately $37,000 to **Crystal Brooks**, and approximately $107,000 to an account controlled by both Marina and Crystal Brooks. **Marina Brooks'** account at Coinbase also received at least $75,000 in investor funds during the timeframe of these transfers.

   d. On or about February 15, 2018, and using investor funds sourced from investors W.V. and S.P., **Charles Brooks** paid **Crystal Brooks** a $5,000 check with the memo line "Commission." In total, **Crystal Brooks** received at least $40,000 in payments from the Brooks' business accounts sourced primarily with investor funds.

   e. From on or about December 20, 2019 to January 3, 2020, using investor funds, a bank account in the name of **Charles Brooks** and Y.P. cleared two checks to

**Marina Brooks** totaling over $21,000, each with the memo line "Commission."

22. Over the course of the scheme, the defendants solicited other investments in their various ventures using similar representations about the potential and the promised high rates of return. As a result of the defendants' conduct, at least 100 victim investors lost at least $9.5 million.

All in violation of 18 U.S.C. § 1349.

## COUNT 2

Violation: 18 U.S.C. § 1956(h)
(Conspiracy to Commit Money
Laundering)

23.   Paragraphs 1 – 22 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

24.   Between 2014 and continuing through the date of this Indictment, in the Eastern District of Texas and elsewhere, the defendants, **Marina Brooks**, **Charles Brooks**, and **Crystal Brooks**, did knowingly conspire with each other and with other persons known and unknown to the Grand Jury to violate 18 U.S.C. § 1956 and 1957, to wit:

   a. to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. § 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

   b. to knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, a violation of 18 U.S.C. § 1343.

All in violation of 18 U.S.C. § 1956(h).

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

Pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 28 U.S.C. § 2461

1. The allegations contained in Counts 1 and 2 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant has an interest.

2. Upon conviction of any violation of 18 U.S.C. § 1349, the defendants, **Marina**, **Charles**, and **Crystal Brooks** shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to the offense(s), pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The property, which is subject to forfeiture, includes but is not limited to, a money judgment, and all interest and proceeds traceable thereto, representing the proceeds of the offenses, for which the defendants are jointly and severally personally liable.

3. Upon conviction of any violation of 18 U.S.C. § 1956, the defendants shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1), including a money judgment representing funds involved in the offense.

4. Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant:

    a. Cannot be located upon the exercise of due diligence;

      b. Has been transferred, or sold to, or deposited with a third party;

      c. Has been placed beyond the jurisdiction of the Court;

      d. Has been substantially diminished in value; or

      e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendants up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the names of the defendants, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

    5. By virtue of the commission of the offenses alleged in this Indictment, any and all interest that the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

_____
GRAND JURY FOREPERSON

DAMIEN M. DIGGS
UNITED STATES ATTORNEY

_____     12/13/2023
ANAND VARADARAJAN                  Date
Assistant United States Attorney

Indictment
Page 14

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | **SEALED** |
| v. | § § | Case No. 4:23 cr270 |
| | § | Judge Mazzant |
| MARINA BROOKS (1) | § | |
| CHARLES BROOKS (2) | § | |
| a/k/a "Chuck" | § | |
| CRYSTAL BROOKS (3) | § | |

## NOTICE OF PENALTY

### COUNT ONE

Violation: 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)

Penalty: Not more than 20 years imprisonment, a fine not to exceed $250,000, or both; supervised release of not more than 3 years.

Special Assessment: $100.00

### COUNT TWO

Violation: 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering)

Penalty: Not more than 20 years imprisonment, a fine not to exceed $250,000, or both; supervised release of not more than 3 years.

Special Assessment: $100.00

Notice of Penalty